U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 JUL 11 PM 3: 02

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ACADIA INSURANCE COMPANY,       )
                                )
  Plaintiff,                    )
                                )
  v.                            )   Case No. 5:15-cv-102
                                )
WELOG, INC., PLUM CREEK MAINE   )
MARKETING, INC., WEYERHAEUSER   )
COMPANY as successor by merger of )
PLUM CREEK MAINE TIMBERLANDS,   )
LLC, and STATE OF VERMONT,      )
                                )
  Defendants.                   )

**OPINION AND ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT**
**(Docs. 36, 47)**

This case begins in the forests of Vermont's Northeast Kingdom. Plum Creek Maine Timberlands, LLC ("Plum Creek"), which owned thousands of acres of forestland, hired WeLog, Inc., a logging company based in New Hampshire, to perform logging on several stands of trees on its property.[1] During inspections that occurred while the logging was taking place, the State of Vermont informed Plum Creek that three stands had been over-logged and, as a consequence, much of Plum Creek's land was no longer eligible for a current use property tax program. Plum Creek appealed the administrative determinations to Vermont Superior Court, which ruled in its favor. The State appealed to the Vermont Supreme Court which, in September 2016, reversed the Superior Court's decision and remanded the case. *Plum Creek Maine Timberlands, LLC v. Vt. Dep't of Forests, Parks, and Recreation*, 2016 VT 103, 155 A.3d 694 [hereinafter *Plum Creek v. Vermont*]. In the meantime, Plum Creek sued WeLog, alleging that WeLog is

---

[1] Plum Creek has been succeeded in interest by Weyerhaeuser Company following a merger. *Plum Creek v. WeLog*, No. 5:16-cv-312, Doc. 1 ¶ 5.

responsible for the over-logging. That case remains pending in this court. *Plum Creek Main Marketing, Inc. v. WeLog, Inc.)*, No. 5:16-cv-312 (D. Vt.) [hereinafter *Plum Creek v. WeLog*]. Acadia Insurance Company, WeLog's insurer, has instituted this suit against WeLog, seeking a declaratory judgment that it is not responsible for defending or indemnifying WeLog in the lawsuit brought by Plum Creek. (Doc. 61.)

WeLog now moves for partial summary judgment, arguing that the laws of New Hampshire apply in construing the insurance contract between Acadia and WeLog. (Doc. 36.) Acadia cross-moves for partial summary judgment, arguing that the laws of Vermont apply instead. (Doc. 47.) The court heard argument on April 5, 2017.

## Background

### I. Underlying Dispute and Procedural Background

The court draws the following facts from the first amended complaint (Doc. 61) and, where appropriate, the Vermont Supreme Court's decision in *Plum Creek v. Vermont*.

In 2007, Plum Creek's predecessor, the Essex Timber Company, enrolled the land in the current use tax program, known as the "Use Value Appraisal Program" ("UVA Program"), pursuant to 32 V.S.A. § 3751 *et seq. Plum Creek v. Vermont*, 2016 VT 103 ¶ 4. (Doc. 61 ¶ 12.)[2] Enrollment in this program enables land owners "who practice long term forest management to have their land appraised for property taxes based on its value or use for forestry, rather than its market value," resulting in a substantially lower property tax assessment. (*Id.* ¶ 14.) If land enrolled in the program is improperly harvested or developed, the state assesses a land-use change tax and excludes the entire parcel from eligibility for the UVA Program for five years, significantly increasing the owner's property tax liability. (*Id.* ¶ 15.)

---

[2] Essex Timber sold the land to Plum Creek in 2008. *Plum Creek v. Vermont*, 2016 VT 103 ¶ 4.

2

Plum Creek entered into a logging contract with WeLog in November 2009 and logging commenced shortly thereafter. (Doc. 61 ¶ 17.) After several site visits by state and county foresters in early 2010, the county forester issued an "adverse-inspection report" identifying violations of the forest management plan in the three stands of trees in question. *Plum Creek v. Vermont*, 2016 VT 103 ¶¶ 8–9. The Vermont Department of Forests, Parks, and Recreation ("FPR") then informed the Division of Property Valuation and Review ("PVR") (within the Vermont Department of Taxes) that Plum Creek's property should "be removed from [the UVA Program] for harvesting contrary to the [forest] management plan." *Id.* ¶ 11. In July 2010, the entire 56,604-acre parcel was removed from the UVA Program and the state assessed a $7,860.80 land-use change tax against Plum Creek.[3] 2016 VT 103 ¶ 11. The ineligibility of the parcel for the UVA Program for five years will increase Plum Creek's yearly property tax assessment by $191,000. (*Id.* ¶ 21.) The adverse-inspection report and the removal of the parcel from the UVA program were upheld in administrative appeals by both FPR and PVR. *Id.* ¶ 15.

Plum Creek sought court review in Vermont Superior Court. *Id.* ¶ 16. The Superior Court concluded that FPR had applied an inappropriate method of measuring "residual basal area"—"the amount of tree stock left after cutting"—and that the adverse-inspection report was therefore not justified. *Id.* ¶¶ 6, 19. In September 2016, the Vermont Supreme Court reversed and remanded. *Id.* ¶ 47. It concluded that FPR's method of measuring residual basal area was appropriate and reinstated the adverse-inspection report. *Id.* ¶¶ 35, 47. It remanded for further proceedings to address "questions raised in Plum Creek's appeal of the PVR Director's decision

---

[3] Acadia's complaint also alleges that an additional land-use change tax of $3,260,409.40 was imposed (Doc. 61 ¶ 25), an amount which Acadia appears to have drawn from Plum Creek's initial complaint in state court (Doc. 61-1 ¶ 54). Plum Creek's new complaint in federal court does not include this additional tax assessment, although it does list other categories of damages. (Doc. 61 ¶ 38; Doc. 61-2 at 9–10.)

removing [the] land from the UVA program and leveling a tax assessment against Plum Creek." *Id.* ¶ 47.

While these proceedings were ongoing, Plum Creek sued WeLog in state court for breach of contract. (Doc. 61 ¶ 22; Doc. 61-1.) Plum Creek subsequently dismissed that suit without prejudice while the State's appeal in the Vermont Supreme Court was pending. (Doc. 61 ¶ 31.) In November 2016, after the Supreme Court ruled, Plum Creek refiled its suit against WeLog, this time in federal court. *Plum Creek v. WeLog*, No. 5:16-cv-312 (D. Vt.).

In this lawsuit, Acadia seeks a declaratory judgment that WeLog's insurance policy with Acadia "provides no liability coverage to WeLog, Inc. for the breach of contract claim asserted against it by Plum Creek" and that "Acadia has no duty to defend or indemnify WeLog, Inc. for the breach of contract claim asserted against it by Plum Creek." (Doc. 61 at 10.) It also seeks a declaratory judgment that Vermont law applies in the coverage dispute. (*Id.*)

Acadia and WeLog have both filed motions for partial summary judgment, contesting whether Vermont or New Hampshire law should apply in interpreting the insurance policy. According to the parties, the choice of law is significant because under New Hampshire law, an insurer must seek a declaratory judgment that it has no duty to defend or indemnify its insured within six months of the filing of the suit which gives rise to the question, N.H. Rev. Stat. § 491:22(III), while Vermont law imposes no such requirement.[4] (Doc. 54 at 2.)

## II. Facts at Summary Judgment

The facts at summary judgment are almost entirely undisputed. WeLog introduces the following uncontested facts: WeLog is a New Hampshire corporation with its principal place of business in New Hampshire; Acadia issued the insurance policy from its office in

---

[4] Neither party makes any argument regarding either the application or interpretation of § 491:22(III), so those issues are not presently before the court.

4

New Hampshire; and WeLog purchased the policy through an insurance broker located in New Hampshire. (Doc. 36-1 ¶¶ 1, 4, 5.) The insurance policy does not include a choice-of-law provision, but its policy number does contain the letters "NH" which establishes that the policy was issued by the New Hampshire office. (*Id.* ¶¶ 3, 6.) Finally, it asserts that WeLog "had a reasonable expectation New Hampshire law would govern the relationship with Acadia Insurance." (*Id.* ¶ 7.) Acadia disputes this last fact, arguing that the facts it has asserted in support of its motion show otherwise. (Doc. 46-2.)

In support of its motion, Acadia introduces additional facts, all of which are also undisputed unless noted. WeLog has been registered to do business in Vermont since 1991 and in 2009 through 2010 had a registered agent for service of process in Barre, Vermont. (Doc. 46-1 ¶¶ 5–6.) WeLog "grosses approximately $2,000,000 in annual revenue and carries about 10 employees" harvesting and hauling timber and performing "construction work for roads and trails and some house lots." (*Id.* ¶¶ 8–10.) In Vermont, WeLog performs both "small jobs" and "winter jobs," which take an entire season to complete. (*Id.* ¶ 18.) In 2008–2009, $39,911 of WeLog's payroll "was attributable to its logging operations" in Vermont. (*Id.* ¶¶ 13–14.) In 2009–2010, $39,147 was attributable to logging work in Vermont and an additional $8,050 to street and road work in the state. (*Id.* ¶¶ 15–16.)

With regard to the insurance policy itself, Acadia states that the policy "covered WeLog, Inc.'s business activities in Massachusetts, New York, Vermont and New Hampshire," and that the policy "contemplated, assessed a premium, and covered [] risk exposure for logging practices in the State of Vermont." (*Id.* ¶¶ 35, 38.) The insurance policy, which assessed "premium bases" calculated on the basis of payroll data for different insured activities, assessed a premium basis of $170,814 for logging and lumbering operations in New Hampshire, $153,347 for road

construction in New Hampshire, $26,800 for forestry service products in New Hampshire, $86,306 for maintenance or storage of equipment or material in New Hampshire, and $106,073 for subcontracted work "in connection with construction, reconstruction, [or] repair in New Hampshire." (Doc. 36-2 at 47–48; Doc. 46-4 at 1.) The listed premium basis for logging and lumbering in Vermont, the only category explicitly listed for that state, is "if any." (Doc. 36-2 at 48.)[5] And finally, when Malcom Washburn, president of WeLog, received the policy, he did not read it and likely just placed it in a desk drawer, though he "understood that the policy covered risks in the State of Vermont." (Doc. 46-1 ¶¶ 33, 37.)[6]

Acadia also introduces undisputed facts concerning WeLog's logging on Plum Creek's land. WeLog worked on Plum Creek's land in Vermont from November 2009 through February 2010. (Doc. 46-1 ¶¶ 19–20.) It logged on approximately 115–120 acres. (*Id.* ¶ 20.) In November, two WeLog employees began work on the project, but by January, a "full crew of eight" was working on it. (*Id.* ¶¶ 21–22.) Mr. Washburn, was "on site in Vermont almost every day." (*Id.* ¶ 22.) At the time of the project, Mr. Washburn knew that the land was enrolled in the UVA Program, that WeLog had to "conduct its logging operations in accordance with all

---

[5] Helen Phillips, an underwriter for Acadia, explains in her affidavit, that an "if any" premium basis for Vermont logging and lumbering was included in the 2009 policy because Acadia believed at the time the policy was underwritten that WeLog "may have been doing business in the State of Vermont but no premium was initially assessed for the Vermont exposures." (Doc. 46-4 at 1.) When the policy was renewed for 2010, Acadia knew that WeLog was doing business in Vermont, but the renewal again included an "if any" premium basis because Acadia lacked "precise payroll or premium information" at the time. (*Id.* at 2.) When in March 2010 Acadia conducted an audit of the 2009 term, it learned that $39,911 of WeLog's payroll was attributable to Vermont logging operations, and therefore issued an endorsement "to reflect the audited exposure in the State of Vermont." (*Id.* at 2.) As a result of the endorsement, WeLog "realized a return in premium." (Doc. 46-1 ¶ 34.)

[6] WeLog disputes the characterization that Mr. Washburn did not read the policy, but Acadia drew this fact from Mr. Washburn's deposition, in which he stated, "I would be really remiss to say that yes, I read it." (Doc. 46-3 at 70; Doc. 54-1 ¶ 37.)

applicable Vermont laws." (*Id.* ¶¶ 25–26.) He was familiar with Vermont forestry, logging, and water quality laws, and kept a small reference book in his pocket. (*Id.* ¶¶ 27–30.) In connection with the project, Mr. Washburn "obtained special highway permits" from the State of Vermont and permits from towns in Vermont for his over-weight trucks. (*Id.* ¶ 31.)

## Analysis

When a party moves for summary judgment, a court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court "constru[es] the facts in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Kazolias v. IBEW LU 363*, 806 F.3d 45, 49 (2d Cir. 2015). The standard is no different when both parties move for summary judgment. "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).

"A federal court sitting in diversity applies the choice-of-law rules of the forum state." *Maryland Cas. Co. v. Continental Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003). Vermont courts have adopted the Restatement (Second) of Conflict of Laws to resolve "choice-of-law questions in both tort and contract cases." *McKinnon v. F.H. Morgan & Co., Inc.*, 750 A.2d 1026, 1028, 170 Vt. 422, 423 (Vt. 2000); *accord Long v. Parry*, 921 F. Supp. 2d 269, 274 (D. Vt. 2013) (citing *McKinnon*).

Three provisions of the Restatement are relevant. Section 6 states general choice-of-law principles and lists factors to be considered in choosing the applicable law.[7] Section 188(1)

---

[7] Section 6(2) lists "the factors relevant to the choice of the applicable rule of law":

7

states that, "with respect to an issue in contract," the law of the state with "the most significant relationship to the transaction and the parties under the principles stated in § 6" should be applied. Section 188(2) lists several factors specific to contract law to assist in making this determination.[8] Section 193 provides that, for contracts of fire, surety, or casualty insurance, "the local law of the state which the parties understood was to be the *principal location* of the insured risk during the term of the policy" should apply, "unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6." (emphasis added.)

The court begins with Section 193 of the Restatement, as it provides specifically for choice of law in the context of casualty insurance. Comment b explains that "[a]n insured risk, namely the object or activity which is the subject matter of the insurance, has its principal

---

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

[8] Section 188(2) states in its entirety:

In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluating according to their relative importance with respect to the particular issue.

8

location, in the sense here used, in the state where it will be during at least the major portion of the insurance period." It continues: "[t]he location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state."

Here, it is clear that the "principal location" of WeLog's logging operations was in New Hampshire. WeLog is incorporated in and has its place of business in New Hampshire. Only a very small percentage of its business in the years in question was attributable to operations in Vermont. WeLog typically grosses $2,000,000 in annual revenue, and had a total payroll of at least $543,340 during the year on which the premium bases in the insurance policy were based.[9] During the relevant years, however, it attributed less than $50,000 of its payroll to logging operations in Vermont. The insurance policy lists six different classifications of insured activities. Five of them are specified for New Hampshire, and each of those has a calculated premium basis, ranging from $170,814 for logging and lumbering operations to $26,800 for forestry service. The single remaining classification—for logging and lumbering in Vermont—lists a premium basis of "if any."

Thus, at the time of contracting, the parties understood that the substantial majority of WeLog's operations, and of its logging operations in particular, would be conducted in New Hampshire. In other words, the parties understood at the time of contracting that the *principal* location of the insured risk was New Hampshire. *See Continental Ins. Co. v. Beecham, Inc.*, 836 F. Supp. 1027, 1036 (D.N.J. 1993) ("[T]he relevant consideration is the location of the risks covered by the contract at the time the contract was entered into and throughout the term of the contract, not where any given insured risk came to fruition.")

---

[9] The court calculates $543,340 as the minimum payroll by summing the premium bases listed in insurance policy (Doc. 36-2 at 47–48).

The fact that the liability at issue in the underlying dispute arose in a state other than New Hampshire or that the parties knew that some risk would occur in other states does not change this analysis. The Second Circuit has explained that the term "principal location" has particular force:

> The language of § 193—applying the "law of the state" (not the "laws of the states") which the parties understood to be "the *principal location* of the insured risks" (not "all the locations of the insured risks")—suggests that the drafters of the Restatement did not intend for courts to apply the laws of more than one state to a single insurance policy. The use of the phrase "principal location" must mean that, where the insured risk is located in more than one state, courts should apply the law of the *one* state in which the parties understood the risk to be *principally* located.

*Maryland Cas. Co.*, 332 F.3d at 152–53. As another court explains, "an analysis that simply equates location of the 'risk' with the location of the occurrence that creates liability, renders the concept of 'principal' location of the risk superfluous." *Employers Mut. Cas. Co. v. Lennox Int'l, Inc.*, 375 F. Supp. 2d 500, 506 (S.D. Miss. 2005).

Acadia argues that the exception to § 193—which specifies that the laws of a state other than the principal location should apply if that state "with respect to the particular issue," "has a more significant relationship under the principles stated in § 6 to the transaction and the parties"—applies here because Vermont has the "most significant relationship" to the issue at hand. (Doc. 57.) Acadia offers a number of reasons in support of its argument: The logging in question occurred in Vermont, and the claims filed by Plum Creek against WeLog were also filed in Vermont. (Doc. 46 at 7–8.) The parties' justified expectations, it asserts, were that Vermont law would apply because Mr. Washburn understood at the time WeLog entered into the contract with Plum Creek that the logging would have to be conducted in accordance with Vermont logging regulations. (*Id.* at 10.) Additionally, Acadia contends that Vermont has a stronger interest in the case than New Hampshire because the logging directly impacted land

10

governed by Vermont's current use property tax program and affected the state's strong interest in promoting sustainable forestry practices. (*Id.* at 11–14.) Resolving this coverage dispute, therefore, "will directly impact Vermont's policies and stated purpose in enacting the current use program." (*Id.* at 14.)

Acadia's argument is unconvincing. First, as already explained, if a court applied the laws of the state where the incident giving rise to liability occurred every time that state differed from the principal location of the insured risk, the exceptions to section 193 would swallow the general rule. Second, what is at issue here is not the logging contract between Plum Creek and WeLog, but the insurance contract between WeLog and Acadia. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 232–33 (3d Cir. 2007) ("We begin the analysis by assessing each state's contacts under the Second Restatement of Conflicts of Laws, bearing in mind that we are concerned with the contract of insurance and not the underlying tort." (internal quotation marks and alterations omitted)). Vermont's interests in Vermont logging and property taxes obviously would weigh significantly in determining any choice of law in the dispute between Plum Creek and WeLog. But this dispute concerns not *whether* Plum Creek will be compensated for alleged over-logging by WeLog, but *who* will pay. The Second Circuit explained the importance of this distinction in *Maryland Casualty*, a case about a dispute over who would be required to pay for the clean-up of toxic waste sites:

> Significantly, this is not a dispute over Grace's liability for the pollution at the various waste sites, and the question of whether the victims of the pollution will be compensated is not involved. Rather, this is merely a dispute over who— Grace or Continental—must bear the cost of defending Grace against the various environmental actions. As the District Court aptly noted, "the interest [of a state in which a waste site is located] diminishes when the question is not whether someone will or can pay for the cleanup but rather who will pay."

332 F.3d at 155 (alterations in the original).

In support of its argument, Acadia relies on *E.B. & A.C. Whiting Co. v. Hartford Fire Ins. Co.*, 838 F. Supp. 863 (D. Vt. 1993). In that case, the federal government sued the plaintiff, a Vermont corporation, for the costs of cleaning up a toxic site in Vermont owned by the plaintiff. *Id.* at 865. The plaintiff then sued its insurance companies for refusing to defend and indemnify it. *Id.* Applying the principles of sections 188 and 193 of the Restatement, the court concluded that Vermont law should apply, even though all of the insurance policies had been "negotiated, executed and paid for in states other than Vermont." *Id.* at 866. Both the "hazardous waste site and the named insured" were located in Vermont, the court explained, so, "[b]ecause defendants knew that plaintiff and the risk to be insured were both located in Vermont, they should have expected to defend any claims against plaintiff in Vermont." *Id.* Additionally, the court noted, "as the state in which the toxic waste is located, Vermont has the strongest interest in how the policies are interpreted because resolution of insurance issues impacts directly on Vermont environmental policies." *Id.*

The case is distinguishable. There is no suggestion in *E.B. & A.C. Whiting* that the plaintiff, a manufacturer of nylon bristle, conducted business in states other than Vermont or that the insurance policies in question insured risks at sites outside Vermont. The *only* location of insured risk identified in the case is the toxic site in Vermont. It is therefore unsurprising that the court, applying section 193, concluded that Vermont law applied to the interpretation of the insurance policies. In comparison, in this case, it is undisputed that the significant majority of WeLog's operations in general, and its logging business in particular, occurred not in Vermont but in New Hampshire.

Accordingly, the court concludes that New Hampshire law applies to the interpretation of the insurance policy between Acadia and WeLog.

## **Conclusion**

WeLog's Motion for Partial Summary Judgment (Doc. 36) is GRANTED.

Acadia's Motion for Partial Summary Judgment (Doc. 47) is DENIED.

Dated at Rutland, in the District of Vermont, this 17 day of July, 2017.

_____
Geoffrey W. Crawford, Judge
United States District Court